UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――――――
COUR PHARMACEUTICALS
DEVELOPMENT COMPANY, INC.,
                              Plaintiff,

              -v-

PHOSPHOREX, INC.,
                              Defendant.
―――――――――――――――――――――――――――――――――

20-CV-4417 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Cour Pharmaceuticals Development Company, Inc. ("Cour"), brings suit against Phosphorex, Inc. ("Phosphorex"), alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious misappropriation, and seeking a declaration of ownership of certain patent applications.  Phosphorex has moved to dismiss the complaint or, in the alternative, to stay the case and compel arbitration.  For the reasons that follow, the motion is granted in part, and the case is stayed pending arbitration.

**I.    Background**

The following facts are drawn from the complaint and presumed true for the purposes of this motion.  (*See* Dkt. No. 1 ("Compl.").)

Plaintiff Cour is an early-stage pharmaceutical company based in Illinois.  (Compl. ¶¶ 1, 17.)  In or around 2007, Dr. Daniel Getts, one of Cour's founders, set out to develop a treatment for West Nile virus and ended up discovering that "small nanoparticles" — made from a biodegradable polymer and other materials — "were capable of quelling the immune system's dangerous inflammatory over-reactions to viral infections."  (Compl. ¶¶ 5-6.)  As Getts and his team developed the nanoparticles, they discovered that the technology might be able to treat a

1

variety of ailments, including peanut allergies, multiple sclerosis, celiac disease, inflammatory bowel disease, and even cancer.  (Compl. ¶ 8.)

In or around 2010, Getts approached Defendant Phosphorex, a Massachusetts-based manufacturing company, about producing the nanoparticles.  (Compl. ¶¶ 9, 18.)  Phosphorex had not previously been in the business of manufacturing "therapeutic nanoparticles," so Getts — and later Cour, once Getts assigned Cour his patent rights — provided the relevant knowledge and specifications to Phosphorex "under strict confidentiality provisions."  (Compl. ¶¶ 10, 12.)

In 2016, however, Cour discovered "that Phosphorex was surreptitiously attempting to patent the inventions that Dr. Getts and Cour had revealed to them in confidence."  (Compl. ¶ 13.)  After Cour threatened litigation, the companies reached a settlement:  Phosphorex agreed to grant Cour a free license to various aspects of the offending applications "and all future applications and patents derived from them," and Cour, in exchange, agreed not to pursue claims for theft of trade secrets and breach of confidentiality.  (Compl. ¶ 14.)  Although Cour was willing to compromise to avoid the cost of litigation, it made sure not to concede "the validity or propriety of the complained-of Phosphorex patent applications."  (*Id.*)

A year later, Cour decided that despite its misgivings about Phosphorex, it would sign a new "Master Services Agreement" ("MSA") with the manufacturer to govern future collaboration.  (Compl. ¶ 15.)  As part of the MSA, Phosphorex agreed that any work product created pursuant to the agreement would belong to Cour.  (*Id.*)  Phosphorex also acknowledged Cour's ownership of "its preexisting intellectual property and agreed that it would not claim such intellectual property as its own."  (*Id.*)  Cour's preexisting intellectual property included a series of nanoparticle patents and patent applications dating from 2011.  (Compl. ¶ 21.)

This action concerns two new Phosphorex patent applications that Cour discovered in late 2019. (Compl. ¶ 16.) Cour alleges that these patent applications cover intellectual property that the parties agreed belongs to Cour. (*Id.*) On June 9, 2020, Cour brought this suit, alleging that Phosphorex had breached "both the 2016 settlement agreement and the 2017 MSA," and shown "an utter and bad faith disregard for Cour's intellectual property and contractual rights." (*Id.*) Phosphorex has filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6); in the alternative, Phosphorex asks the Court to stay this proceeding and compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* (*See* Dkt. No. 16.)

## II.    Discussion

Phosphorex argues that the case ought to be dismissed — or, in the alternative, stayed — because "all of the claims are subject to a mandatory arbitration clause" in the 2017 MSA. (Dkt. No. 17 at 15.) Cour counters that its claims fall within one of the MSA's exceptions to arbitration and therefore belong in federal court. (*See* Dkt. No. 19 at 7.)

Under the Federal Arbitration Act, "an agreement in writing to submit to arbitration … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Courts view the Act as espousing "a liberal federal policy favoring arbitration agreements," reflecting Congress's "recognition of the desirability of arbitration as an alternative to the complications of litigation." *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 830 (2d Cir. 1988) (internal quotation marks and citation omitted). Still, since arbitration "is a matter of contract … a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit." *Robinson v. Entm't One US LP*, 14-CV-1203, 2015 WL 3486119, at *3 (S.D.N.Y. June 2, 2015). "When a plaintiff's claims are arbitrable, the ordinary remedy contemplated by the Federal Arbitration Act is a stay." *Sollinger v. SmileDirectClub, LLC*, No. 19-CV-5977, 2020

WL 774135, at *4 (S.D.N.Y. Feb. 18, 2020) (citing 9 U.S.C. § 3).  To determine whether a stay is appropriate, a court must resolve four issues: "(1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some but not all claims are arbitrable, whether the remaining claims should be stayed pending arbitration." *Robinson*, 2015 WL 3486119, at *4 (internal citation omitted).

A court must first ask the threshold question of "'whether the parties have indeed agreed to arbitrate' at all." *Sollinger*, 2020 WL 774135, at *2 (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012)).  This is a question of state contract law, and in New York, "the touchstone of contract is mutual manifestation of assent, whether by written or spoken word or by conduct." *Id.* (cleaned up).  Here, there is little doubt that the parties mutually agreed to arbitrate.  Under Section 15.2 of the MSA, the parties agreed — subject to certain exceptions — that "any claim, dispute, or controversy of whatever nature arising out of or relating to this Agreement … including, without limitation, any action or claim based on tort, contract, or statute, or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement, shall be resolved by final and binding arbitration." (Dkt. No. 10–1 § 15.2(a).)  That language "clearly manifests an intention by the parties to submit certain disputes to a specified third party for binding resolution." *McDonnell*, 858 F.2d at 830.

Having determined that Section 15.2 constitutes an enforceable arbitration clause, the Court must next decide "whether the dispute at issue comes within the scope of the arbitration agreement." *Sollinger*, 2020 WL 774135, at *3 (quoting *In re. Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011)).  In the Second Circuit, this involves "first determin[ing] whether the arbitration clause at issue is broad or narrow." *Polit v. Glob. Foods*

*Int'l Corp.*, No. 14-CV-7360, 2015 WL1780161, at *3 (S.D.N.Y. Apr. 20, 2015) (internal citation omitted).  If the clause is narrow, "the court must determine whether the particular dispute involves a matter that is on its face within the purview of the clause or a collateral matter"; if the dispute involves a collateral matter, then arbitration is not appropriate.  *Id.* (internal quotation marks and citation omitted).  If the clause is broad, on the other hand, "there arises a presumption of arbitrability."  *Id.* (internal citation omitted).  But this presumption can be rebutted if the dispute concerns a matter that is "clearly collateral" to the contract — if, in other words, "the factual allegations underlying the dispute do not touch matters covered by the contract."  *Id.* (internal quotation marks and citations omitted).  And even where an agreement contains a broad arbitration clause, "a dispute is not arbitrable if (1) an express provision in the … agreement excludes the particular grievance from arbitration, or (2) 'forceful evidence of a purpose to exclude the claim from arbitration' is presented."  *Maryland Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 983 (2d Cir. 1997) (quoting *AT & T Techs., Inc. v. Commc'ns. Workers of America*, 475 U.S. 643, 650 (1986)).

      Here, the arbitration clause in the MSA is a "quintessential broad arbitration clause." *Polit*, 2015 WL1780161, at *3.  The clause subjects to arbitration "*any* claim, dispute, or controversy *of whatever nature* arising out of or relating to this Agreement."  (Dkt. No. 10–1 § 15.2(a) (emphasis added).)  Courts have typically found such language indicative of a broad agreement.  *See Polit*, 2015 WL 1780161, at *3 (holding that an arbitration clause was broad where it stated that "[a]ny claim or controversy that arises out of or relates to [the employment agreement], or breach of it, shall be settled by arbitration" (internal citation omitted)); *see also Collins & Aikman Products Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) (holding that a clause "submitting to arbitration 'any claim or controversy arising out of or relating to the

5

agreement,' is the paradigm of a broad clause" (brackets omitted)); *cf. Manos v. Geissler*, 321 F. Supp. 2d 588, 593 (S.D.N.Y. 2004) (holding that an arbitration clause was narrow where it applied "only to a single issue" and thus did "not purport to encompass all disputes that arise under" the agreement).

Since the arbitration clause in the MSA is broad, "there is a presumption that the entire dispute is subject to arbitration." *Polit*, 2015 WL 1780161, at *3. But this presumption may be rebutted in two ways: (1) if Cour's claims concern matters "clearly collateral" to the contract, *id.* (internal citation omitted), or (2) if there is either an express provision excluding Cour's claims from arbitration or if there is "forceful evidence of a purpose" to exclude the claims from arbitration, *Maryland*, 107 F.3d at 983 (internal citation omitted). The Court considers each possibility in turn.

First, the Court concludes that the factual allegations underlying Cour's claims are not collateral to the MSA. Cour's first three causes of action straightforwardly "touch matters covered by the contract" by implicating "the parties' rights and obligations" under the MSA. *See Polit*, 2015 WL 1780161, at *3 (internal quotation marks and citation omitted). Cour's first cause of action seeks "a declaration of ownership of the Phosphorex '780 patent application and all similar applications," on the basis that the Phosphorex patent application covers intellectual property that Cour owns "pursuant to the 2017 MSA." (Compl. ¶¶ 73, 82.) Cour's second cause of action is similar: It asks for a "declaration of ownership of the Phosphorex '780 and '851 patent applications and all similar applications," on the basis that those applications "constitute [Cour's] Work Product," as defined in the 2017 MSA. (Compl. ¶¶ 86, 89.) The third cause of action, meanwhile, is for breach of the MSA (*see* Compl. ¶¶ 90–105), and therefore clearly

6

"touch[es] matters" covered by the agreement. *See Polit*, 2015 WL 1780161, at *3 (internal citation omitted). Cour has withdrawn its fourth cause of action. (*See* Dkt. No. 19 at 14.)

Cour's fifth cause of action is the subject of the parties' biggest disagreement. It concerns a breach of the implied covenant of good faith and fair dealing with respect to the 2016 settlement agreement between Cour and Phosphorex. Specifically, Cour alleges that Phosphorex could have filed its '780 and '851 applications as related to the patent applications at issue in that agreement; since it did not, Cour alleges that Phosphorex "denied Cour … its rightful license under that Agreement." (Compl. ¶¶ 113-125.) Cour argues that the arbitration clause in the MSA does not apply to the 2016 settlement agreement because "even a broad arbitration clause in one contract d[oes] not apply to another distinct contract." (Dkt. No. 19 at 22.) But "[c]ourts have routinely concluded that arbitral agreements may cover separate agreements or contracts that relate to the substance of the agreement containing the arbitral clause." *Robinson*, 2015 WL 3486119, at *7. In *Robinson*, for example, the court concluded that claims arising out of an oral agreement were subject to an arbitration agreement in a separate employment contract because of "the overlapping issues" between the allegations under the oral agreement and construction of the employment contract. *Id.* The court reasoned that "adjudication of the Plaintiff's rights under the alleged oral contract would plainly be impossible without refence to the Employment Agreement." *Id.* The circumstances here are much the same. The factual allegations underlying the fifth cause of action – which concern ownership of and access to the Phosphorex patent applications – cannot be evaluated without reference to the intellectual property provisions of the MSA. This is all the more so given that the MSA, by mutual agreement, "supersedes all prior and contemporaneous agreements and communications, whether oral written or otherwise, concerning any and all matters contained herein" – and therefore supersedes the 2016 settlement

agreement when it comes to disputes relating to ownership of intellectual property. (Dkt. No. 10–1 § 16.5.) Cour's fifth cause of action thus "touch[es] matters" covered by the MSA. *See Polit*, 2015 WL 1780161, at *3 (internal citation omitted).

Finally, Cour's sixth and final cause of action is an unfair competition and misappropriation claim based on "Phosphorex's filing of patent applications claiming Cour's intellectual property." (Compl. ¶¶ 131, 132.) As Cour concedes, its alleged ownership of the intellectual property in question "flows both from inventorship *and contract*," thus making explicit the connection between this claim and the rights and obligations flowing from the MSA. (Compl. ¶ 128 (emphasis added).)

Having determined that none of Cour's claims are clearly collateral to the MSA, the Court turns to Cour's argument that Section 15.3 of the agreement expressly excludes its claims from arbitration. (*See* Dkt. No. 19 at 6.) Under that provision, the parties carved out two exceptions to their general agreement to arbitrate. The first, which is not implicated here, allows the parties to bring an action in court "in the context of a *bona fide* emergency or prospective irreparable harm." (Dkt. No. 10–1 § 15.3) The second allows the parties to sue in court "to resolve disputes pertaining to the validity, construction, scope, enforceability, infringement or other violations of patents or other proprietary or intellectual property rights." (*Id.*) Cour cites dictionary definitions of "proprietary" to argue that "disputes pertaining to … proprietary … rights" include disputes over the ownership of patent applications. (Dkt. No. 19 at 7, 7 n.6.) In the context of the clause at issue, this interpretation is unpersuasive. For one thing, the use of "or other" in "patents or other proprietary or intellectual property rights" suggests that proprietary and intellectual property rights are meant to refer to things that are similar to patents, such as trademarks, copyrights, and trade secrets. *See, e.g.*, *Universal City Studios, Inc. v. Lollypop*

*Trading*, No. 93-CV-5641, 1993 WL 328848, at *1 (S.D.N.Y. Aug. 24, 1993) (referring to plaintiffs' ownership of "copyrights, trademarks[,] and other proprietary rights"); *Paramount Pictures Corp. v. Leslie Rubinowitz*, No. 81-CV-0925, 1981 WL 1396, at *1 (E.D.N.Y. June 26, 1981) (referring to plaintiff's "copyrights, trademarks, and other proprietary rights").  For another, defining "proprietary rights" to include ownership would render the rest of the sentence nonsensical.  As Phosphorex points out (*see* Dkt. No. 23 at 7), "validity, construction, scope, enforceability, infringement or other violations" are words typically used to refer to patents, copyrights, and trademarks – but not to intellectual property ownership. *See, e.g.*, *Doukas v. Ballard*, 825 F. Supp. 2d 377, 382 (E.D.N.Y. 2011) (contrasting claims "that would impact the validity of the patent" with claims seeking to establish patent ownership); *Mister B Textiles Inc. v. Woodcrest Fabrics, Inc.*, 523 F. Supp. 21, 23 (S.D.N.Y. 1981) ("Defendant contests both plaintiff's ownership of its patent, and the patent's validity.").  In light of these considerations, the exception in Section 15.3 is not best interpreted to cover disputes over the ownership of patent applications, which form the backbone of the allegations in the complaint.

Perhaps realizing this, Cour also attempts to portray some of its causes of action as pertaining to "patent claim construction and scope," which would render them subject to the arbitration exception in Section 15.3.  (*See* Dkt. No. 19 at 6-7, 12, 19.)  This description is a stretch.  As Phosphorex points out (Dkt. No. 23 at 8), issues of patent validity, construction, scope, enforceability, and infringement are governed by federal patent law, while patent ownership is a question of state law.  *See, e.g.*, *Moss v. Moss Tubes, Inc.*, No. 96-CV-1407, 1997 WL 727611, at *3 (N.D.N.Y. Aug. 21, 1997) ("[A]lthough a cause of action for patent infringement is governed exclusively by federal law, the issue of ownership of the patents is governed by state law."); *VariBlend Dual Dispensing Sys. LLC v. Crystal Int'l (Grp.) Inc.*, No.

9

18-CV-10758, 2019 WL 4805771, at *5 (S.D.N.Y. Sept. 30, 2019) (holding that claim "arises under" federal law where it raises "questions of patent inventorship and claim construction). Given that Cour asserts no federal claims in the complaint, its claims cannot fairly be described as relating to patent construction and scope. Instead, the factual allegations in the complaint concern a straightforward dispute over patent ownership, which does not fall under the MSA's arbitration exceptions.

The Court therefore concludes that Cour has not rebutted the presumption of arbitrability flowing from the broad arbitration agreement in the MSA. As there are no federal statutory claims in the complaint, and all of the claims are arbitrable, *see Robinson*, 2015 WL 3486119, at *4, the only remaining question is what remedy is appropriate. Phosphorex argues for a full dismissal of the case and, in the alternative, for a stay pending arbitration. The Second Circuit has held that outright dismissal is ordinarily not appropriate. *See Katz v. Cellco Partnership*, 794 F.3d 341, 346 (2d Cir. 2015) (holding that although "efficient docket management is often the basis for dismissing a wholly arbitrable matter," that prerogative "cannot trump a statutory mandate, like Section 3 of the FAA, that clearly removes such discretion"). Instead, where, as here, all of the claims are arbitrable and a stay has been requested, "the text, structure, and underlying policy of the FAA mandate a stay of proceedings." *Id.* at 347. Therefore, Phosphorex's request for a stay is granted.

**III.     Conclusion**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED in part, to the extent that Defendant's alternative request to compel arbitration and stay the case is granted. This case is hereby stayed pending arbitration.

The Clerk of Court is directed to close the motion at Docket Number 16 and to mark this case as stayed.

SO ORDERED.

Dated: March 19, 2021
       New York, New York

J. PAUL OETKEN
United States District Judge